UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR415-133 |
| | ) | |
| DAVON S. GREEN | ) | |

## **REPORT AND RECOMMENDATION**

Davon Green has been indicted for carjacking a vehicle in this district, brandishing a firearm during that carjacking offense, and the interstate transportation of the stolen vehicle from Georgia to South Carolina. He seeks to suppress both the evidence seized at the time of his warrantless arrest by South Carolina law enforcement officers and his subsequent confessions. Docs. 15, 16, 32. Green elected not to testify or offer any evidence at the hearing on his suppression motions. The unrebutted evidence offered by the government at that hearing establishes that none of Green's constitutional rights were infringed by the arresting officers. Accordingly, defendant has shown no grounds for the suppression of evidence in this case.

# I. FACTS

## A. The Crime Spree and the Police Chase

On October 8, 2014, a black male approached a woman operating a tan Honda Accord in Effingham County, Georgia, forced her out of the car at gunpoint, and then drove off in the carjacked vehicle. The next day, several black males operating a tan Honda Accord approached a woman in Hampton County, South Carolina and carjacked her vehicle, also a tan, or gold, Honda Accord.

In the early morning hours of October 10, 2014, two black males entered a Kangaroo convenience store in Port Royal, South Carolina, held a gun to the head of the clerk, and stole money, beer, and cigarettes. They left the store in a tan Honda Accord. Later that day, several black males driving a tan Honda Accord attempted to carjack another Honda Accord, but the owner of that vehicle sped away and furnished the police with a description of the men and their vehicle.

Later that day, Master Sgt. Todd Calhoun of the Beaufort County Sheriff's Office spotted a gold Honda Accord containing multiple passengers and began to follow the vehicle. His dispatch confirmed that the vehicle he was following had been carjacked. After a backup officer

arrived in another vehicle, Sgt. Calhoun activated his emergency lights. But rather than pulling over, the Honda sped up and attempted to elude the officer. When the Honda crossed the county line into Jasper County, Sheriff's Deputy Eric Ager took the lead position in the car chase. Eventually, the Honda Accord turned abruptly in front of Deputy Ager and collided with his vehicle. Immediately, three black males exited from the passenger side of the Honda Accord and fled on foot.

After a brief search, officers located defendant Green hiding under the porch of a nearby residence. They seized Green, placed him on the ground, and handcuffed him. The officers found a pistol in Green's right front pants pocket.

### B. The Interviews

At 12:36 p.m. on October 10, two deputies with the Beaufort County Sheriff's Office (Sgts. Seifert and Albertin) interviewed Green at the Jasper County Sheriff's Detention Center. They recorded that two-hour and twenty-two minute interview using a portable audio recorder. After advising Green of his rights and obtaining a signed waiver of those rights on a "Miranda Waiver Form" (Gov't Ex. 4), Green gave a full confession. Following that interview, Lieutenant Kevin Firster with the

Hampton County Sheriff's Office conducted a second, unrecorded interview of Green. In that hour-and-a-half interview, Green again waived his rights (Gov't Ex. 5) and then confessed to participating in the crimes under investigation. On October 14, 2014, Detective Sgt. Robert Bilyard of the Port Royal Police Department interviewed Green a third time. This interview, which was video recorded (Gov't Ex. 6), lasted some 30 minutes. Green executed a written waiver of his rights (Gov't Ex. 7) and confessed to the armed robbery of the Port Royal convenience store.

## II. DISCUSSION

### A. Motion to Suppress Evidence

Green moves to suppress all evidence recovered as a result of his seizure and arrest on October 10, 2014. Doc. 16. He makes the unsworn assertion[1] that he was "merely a passenger" in the Honda Accord that was chased and eventually stopped by South Carolina law enforcement officers. *Id.* at 1. He also boldly states (but without offering any argument on the point) that the pursuing officers lacked any

---

[1] Local Crim. Rule 12.1 requires that every factual assertion in a motion be supported by a reference to the existing record or by an affidavit submitted with the motion. Green neglected to comply with that rule.

4

"information which would create a reasonable suspicion that [he] or any other occupant was involved in any criminal activity." *Id.* Further -- and this was made the focus of his argument at the suppression hearing -- Green contends that because the South Carolina officers could not identify him as the driver of the Honda Accord, they were not justified in charging him with "Failure to Stop for Blue Lights" in violation of the South Carolina traffic code, *id.*, and hence "his initial detainment" was illegal. *Id.* at 2.

At the suppression hearing, Green's counsel suggested that he had never argued that the officers lacked any grounds to conduct a traffic stop of the Honda Accord. But Green's brief clearly asserts that the officers had no reasonable suspicion to believe that any occupant of the vehicle was involved in criminal activity; and if this is so, then even the initial traffic stop was unlawful. *See Brendlin v. California*, 551 U.S. 249, 256-58 (2007) (a vehicle passenger, who has no privacy interest in the vehicle sufficient to challenge its *search*, nevertheless has "standing" to challenge the unlawful *stop* of that vehicle). Thus, the Court will pause to state the obvious: Under the totality of the circumstances presented, the officers not only had reasonable suspicion but also

probable cause to stop and seize the occupants of the Honda Accord. South Carolina law enforcement officers had been on the lookout for a tan or gold (or possibly silver) Honda Accord, for such a vehicle had recently been used in the commission of several violent crimes, including both multiple carjackings and an armed robbery. Each of the violent crimes had been committed by one or more young black males. When a Beaufort County sheriff's deputy spotted a gold Honda Accord with three occupants, a records check confirmed that the vehicle had been carjacked. The deputy then engaged his emergency lights, but the Honda ignored the signal to pull over and tried to elude the officer. A lengthy chase ensued, culminating in the collision of the Honda Accord with one of the pursuing police vehicles. The three black male occupants of the Honda bailed out of their vehicle and fled on foot. Green was soon located, removed from his hiding place, and found to have a pistol concealed in his pocket.

Probable cause to effect a warrantless arrest "exists when the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being

committed by the person to be arrested." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1992); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). Probable cause is a "fluid concept" not easily reduced to a neat set of rules. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The assessment of probable cause depends on the totality of the circumstances presented in an individual case. *Allison*, 953 F.2d at 1350. While probable cause demands more than mere suspicion, it requires far less than proof beyond a reasonable doubt or even "a prima facie showing of criminal activity." *Gates*, 462 U.S. at 235. Rather, it is simply a "fair probability" or "substantial chance" of criminal activity that is required, "not an actual showing of such activity." *Id.* at 244 n. 13.

Here, a South Carolina law enforcement officer endeavored to stop a vehicle that he knew had been stolen during a carjacking offense and that matched the description of a vehicle used during a spate of recent violent crimes. When that vehicle, occupied by several passengers, then ignored the police blue lights and began to flee, the officer had reasonable cause to believe that he had located not only one of the carjacked vehicles but also the carjackers themselves. The subsequent

7

behavior of the vehicle occupants -- crashing into a police vehicle and then fleeing on foot -- only heightened the notion that these were the criminals who were the subject of the police dragnet. Once the officers apprehended Green and discovered that he was carrying a pistol, the probable cause basis for the belief that he was involved in the recent gun-related robbery and carjackings was confirmed.[2]

Both in his brief and at the suppression hearing Green argued that because the officers charged him with an offense that he did not commit (*i.e.*, failure to stop for blue lights[3]), any evidence obtained as a consequence of his arrest upon that inapplicable charge must be suppressed. This argument rests upon a fallacy: that law enforcement officers must, at the time of arrest, not only inform the arrestee of the

---

[2] Even if there was not probable cause to arrest Green on carjacking or robbery charges, the presence of a gun in his pocket clearly furnished the officers with probable cause to arrest him for a firearms offense. *See* S.C. Code Ann. § 16-23-20 (prohibiting the carrying of a handgun "about the person . . . whether concealed or not," unless one of 16 exceptions applies, none of which has been shown to be applicable here). South Carolina officials in fact charged, and later indicted, Green for unlawfully carrying the pistol found in his pocket. Doc. 31 (Gov't Supp'l Brf.) at 2.

[3] S.C. Code Ann. § 56-5-750 makes it unlawful for the "driver" of a motor vehicle to fail to stop in response to a police siren or flashing light. Green argues that the officers wrongly charged him with a violation of that statute, as they were unable to identify him as the driver of the Honda Accord that tried to outrun the pursuing officers.

grounds for the arrest but must identify the particular offense for which they have probable cause, and if they get it wrong, they are foreclosed from later amending the charge to reflect the correct offense. This proposition is simply not true. First, an officer who has probable cause to arrest is under no constitutional obligation to inform the arrestee of the reason for his arrest. *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."). Second, if the officer does choose to announce the grounds for the arrest, there is no constitutional requirement that he state the correct statutory provision in order for the arrest to be valid. In other words, a warrantless arrest is reasonable under the Fourth Amendment if the objective facts known to the officer establish probable cause to believe that *any* crime has been committed; the officer's "subjective reason for making the arrest" is "irrelevant" to the Fourth Amendment inquiry. *Id.* at 153; *Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002) ("Quite simply, '[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.' . . . Indeed, '[w]hen an officer makes an arrest, which is properly

supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.'").

Green's contention that the South Carolina law enforcement officials "unlawfully seized and searched" him is utterly bogus. Doc. 16 at 2. His motion to suppress the pistol found in his pocket and the other evidence located in the Honda Accord should therefore be denied.

## B. Motion to Suppress Statements

Green contends that the statements he made during interviews conducted by law enforcement officers following his arrest -- two on the day of his arrest and a third conducted four days later -- must be suppressed because they were involuntary and made "without sufficient advisement of [his] rights." Doc. 15 at 1. There is no merit to this argument.

The evidence reflects that before questioning Green about his involvement in any criminal activity, the law enforcement officers conducting the interviews not only administered the standard *Miranda*[4]

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (prior to custodial interrogation, a suspect must be advised "that he has a right to remain silent, that any statements he

warnings but obtained Green's written waiver of his rights. *See* Gov't Exs. 4, 5, 7. During each interview Green gave appropriate answers to the officers' questions, exhibited no signs of intoxication or mental impairment, and declined the offer of food or the opportunity to take a restroom break. Green does not dispute this. He nonetheless claims that his waivers were ineffective because the officers who conducted the first interview "obscured the practical and legal significance of the written advisement" of his rights by minimizing their importance and conveying the impression that the rights advisement was "mere procedure" rather than the explanation of important "substantive rights." Doc. 32 at 8. He reasons that the second and third interviews were the tainted fruit of this initial illegality.

To be effective, a waiver of *Miranda* rights must be both "knowing and intelligent" -- *i.e.*, made with a full awareness of the nature of the rights and the consequences of waiving them -- and "voluntary" in the sense that the waiver is not the product of any form of government coercion. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Dunkins v. Thigpen*, 854 F.2d 394, 398-99 (11th Cir. 1988); *see Colorado v. Connelly*,

---

does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). The court makes these assessments by examining the "totality of the circumstances" surrounding the interrogation. *Fare v. Michael C.*, 442 U.S. 707, 725-26 (1979). While a defendant's youth and inexperience with law enforcement are certainly important factors to be considered, the courts have on many occasions upheld *Miranda* waivers made by juveniles younger than Green. *See, e.g., Hall v. Thomas*, 611 F.3d 1259 (11th Cir. 2010) (15-year-11-month-old defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights); *Fare*, 442 U.S. 707 (16-&-1/2-year-old defendant knowingly and voluntary waived his Fifth Amendment rights despite asking to speak with his probation officer during questioning); *Paxton v. Jarvis*, 735 F.2d 1306 (11th Cir. 1984) (defendant one month shy of his sixteenth birthday made a knowing and voluntary waiver of his rights even though he was questioned off and on throughout the night). Indeed, a juvenile who has lower-than-average intelligence or reading ability may make an effective waiver of his rights where the circumstances reveal that he understood his rights and was not pressured to waive them. *Rogers v. Quarterman*,

555 F.3d 483 (5th Cir. 2009) (15-year-old defendant who read only at a third or fourth grade level and was a "slow learner" with a low IQ, and who had no prior experience with the criminal justice system, nevertheless understood his rights and made a knowing and voluntary waiver); *Dunkins*, 854 F.2d at 399 (19-year-old functionally illiterate and moderately retarded suspect understood his *Miranda* rights and knowingly and voluntarily waived them).

Despite the uncontroverted evidence that the officers carefully advised Green of his rights before each interview, and despite any evidence that he lacked the capacity to understand the *Miranda* warnings or that the officers bullied or threatened him in any way, Green insists that his decision to waive his rights and speak to the officers was ineffective. His argument rests exclusively on certain statements made by the two officers who conducted the first interview.[5] The evidence reflects that, upon entering the small cafeteria (or

---

[5] Green asserted in his brief that he was "denied access to an attorney" and to his family, that the officers "didn't give him sufficient time to consider his rights" and "began questioning [him] before advising him of his rights," and that they informed him of his rights "in a nonchalant, dismissive" manner in an effort to prevent him from understanding his rights. Doc. 15 at 2, 3. Not only did Green fail to offer any evidence to support these assertions, the testimony and exhibits introduced at the suppression hearing refute each of these claims.

breakroom) where Green was seated at a table with four to six chairs, Officers Doug Seifert and Laurel Albertin made the following comments during their initial exchange of pleasantries:

1. Seifert (0:50): "You're 18 years old, man, and we want to try and get you on the right path. . . . The best I can tell you is that honesty is the best policy. . . . We hope that we can change you and I mean that sincerely."

2. Seifert (1:37): "So we are going to go over procedure, what we have to do [is] the *Miranda* form, okay . . . ."

3. Albertin (2:35): "Alright, I'm just going to read this to you, . . . as this is part of the procedure before we talk to you and obviously you can stop talking to us at any time, you just tell us that you don't want to talk to us anymore."

Gov't Ex. 3 (audio recorded interview).

Sgt. Albertin then advised defendant of his rights by reading from the standard "Miranda Warning Form" used by the Beaufort County Sheriff's Office. Gov't Ex. 4. She read the form in a clear voice and in an unhurried manner. The officer asked Green to initial either "Yes" or "No" in response to the form's question whether he understood his rights. Green indicated "Yes." *Id.* She then asked him to indicate either "Yes" or "No" in response to the question asking whether he wished to "talk to us now." Without any prompting from the officer, Green initialed the "Yes" block. *Id.*

The Court finds that, viewing the totality of the circumstances, Green made an uncoerced choice and had the requisite level of understanding at the time of the waiver. At no point did the officers threaten Green or promise him that he would not be prosecuted, that he would face a lesser charge, or that he would receive leniency in exchange for his cooperation. Nor did they even *predict* that he might receive some certain benefit if he agreed to talk. *See* 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.2(c) at 624 nn. 100, 101 (distinguishing between a will-overbearing promise of leniency "from a mere prediction" of favorable treatment upon cooperation, and noting that statements inducing a hope of leniency in the mind of the suspect "'are only objectionable if they establish an express *quid pro quo* bargain for the confession.'").

Further, encouraging a suspect to be "truthful and honest," or even assuring him that "all cooperation is helpful" (when this is *not* true in every case), *United States v. Rutledge*, 900 F.2d 1127, 1128 (7th Cir. 1990), does not offend *Miranda*'s precepts. "Statements which focus on the possible benefits of cooperation, but which fail to explain that a suspect's cooperation may not always be to his advantage, are 'the sort of minor fraud that the cases allow.'" *United States v. Huggins-McLean,*

2015 WL 370237 at * 4 (S.D. Ga. Jan. 28, 2015) (quoting *Rutledge*, 900 F.2d at 1131). Here, the officers did not say anything to Green that "'made it impossible for [him] to make a *rational* choice as to whether to confess.'" *United States v. Lall*, 607 F.3d 1277, 1286 (11th Cir. 2010) (quoting *Rutledge*, 900 F.2d at 1127).

Nor did telling Green that the administration of *Miranda* warnings was part of the standard "procedure" that the officers must follow before conducting an interview misrepresent anything. *Miranda* itself mandated the use of certain "procedures" designed to secure the privilege against self-incrimination during custodial interrogation. 384 U.S. at 439; *id.* at 444 (referencing the "procedural safeguards" announced by that decision). Thus, by stating that they had to follow the "procedures" established by *Miranda*, the officers did no more than inform Green of what the law requires. At no point did the officers mischaracterize the nature of the *Miranda* warnings or "minimize" their importance. Indeed, even before reading him his rights, Sgt. Albertin emphasized that Green "obviously" had the right to "stop talking to us at any time." Gov't Ex. 3 (2:35).

Green also complains that, after the *Miranda* warnings were given but before he confessed, his interrogators exaggerated the nature and quality of the evidence against him (referencing a photo lineup identification of Green that did not exist), and told him that a display of "remorse" on his part would be particularly meaningful to one of his victims, who was "a good Christian." First, it is well settled that a mere "misrepresentation of fact" about the nature and strength of the government's evidence is "not enough to render a suspect's ensuing confession involuntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). So, even if the officers did overstate the strength of their evidence, that misrepresentation did not undermine the validity of Green's decision to waive his rights and speak with the officers. Nor did the officers impermissibly coerce a confession from Green by suggesting to him that a demonstration of remorse would "kind of make it right somehow" in the mind of one of the victims with religious sympathies. Suggesting that *one* of his victims might personally forgive him for his conduct did not serve to hollow out the blunt warning that anything he said to the officers "*will be* used against you in a court of law." Gov't Ex. 4 (emphasis added). To borrow a line from a movie, while confession to a

17

serious crime may be good for the soul and "put you square with the Lord, the State of [South Carolina] is a little more hard-nosed." O BROTHER, WHERE ART THOU? (Touchstone Pictures 2000) (statement made by Ulysses Everett McGill (George Clooney) to Delmar O'Donnell (Tim Blake Nelson)). The officers here effectively left Green with that realistic impression.

None of the officer comments highlighted by Green in his brief -- that they were trying to get him "on the right path," that "honesty is the best policy," that they must respect *Miranda* "procedure," or that he might be forgiven by one of his victims if he showed remorse -- was sufficient to "obscure[] the practical and legal significance" of the *Miranda* warnings. Doc. 32 at 8. The Court finds that although Green was but 18 years old, he was fully capable of understanding, and did understand, the plain warning that anything he said "will be used against you in a court of law." It further finds that the officers did not coerce his confession through any form of police misconduct. Because Green made a knowing and voluntary waiver of his privilege against self-incrimination, his custodial statements are not subject to suppression.

## III. CONCLUSION

Green's motions to suppress evidence (doc. 16) and his various confessions (doc. 15) should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 4th day of November, 2015.

                                           *[signature]*
                                          UNITED STATES MAGISTRATE JUDGE
                                          SOUTHERN DISTRICT OF GEORGIA